**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| GEORGETTE SHERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:21-cv-0924-DGK |
| | ) | |
| DENNIS R. McDONOUGH, | ) | |
| SECRETARY OF THE DEPARTMENT | ) | |
| OF VETERAN AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT SUMMARY JUDGMENT

This case arises out of Plaintiff Georgette Sherman's employment with the Veteran's Administration in Kansas City, Missouri ("KCVA"). Plaintiff maintains that while working at the KCVA she experienced discrimination and harassment based on her race and sex, and was retaliated against for complaining about her treatment.

Now before the Court is Defendant Secretary of the Department of Veterans Affairs' motion for summary judgment. ECF No. 55. Because Sherman cannot substantiate her allegations with sufficient evidence on any of her claims, the motion is GRANTED. While Sherman may sincerely believe she was subjected to discrimination and retaliation, that is not enough to survive summary judgment.

### Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under

the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving part[ies]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of showing a lack of a genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). To survive a motion for summary judgment, the nonmoving party must substantiate her allegations with "sufficient probative evidence that would permit a finding in her favor based on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (quotation omitted).

**Undisputed Material Facts**

To resolve the motion, the Court must first determine the material undisputed facts, which are as follows.[1]

**Sherman's Background at KCVA and Promotion to MSA Supervisor**

Sherman, an African American woman, began working at the Kansas City VA Medical Center ("KCVA") in 2005 as a radiology technologist. Around 2009 Sherman began working as the supervisor of the medical support staff in radiology. In September 2018, Sherman began working as the Supervisory Medical Support Assistant ("MSA") in the Office of Community Care ("the OCC"). The supervisory MSA position was a GS-8 level position.

---

[1] The Court has limited the facts to those that are undisputed and *material* to the pending summary judgment motion. *See* Fed. R. Civ. P. 56(c) (emphasis added); L.R. 56.1(a). The Court has excluded legal conclusions, argument presented as fact, and proposed facts not properly supported by the record or admissible evidence. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). It has also excluded facts proposed by a party that are not subsequently referenced in the party's summary judgment briefing. The Court has included proposed facts that are material and which have been improperly controverted. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has not included most of Sherman's 248 proposed additional facts because they are either irrelevant, unsupported, based on inadmissible hearsay or inadmissible opinions, or consist of legal conclusions.

Sherman's initial supervisor when she took the position was Rebecca Johann. Johann's title from 2019–2021 was Nurse Manager. According to the OCC organizational chart, the Nurse Manager, Supervisory MSA, and the Administrative Officer all report to the Program Manager.

Approximately three or four months after Sherman began working in the OCC, Angela Frey was appointed Acting Director (Program Manager)[2] of the OCC. Neither party's proposed statement of facts indicates Frey's race. As best the Court can tell, Frey is not African American and is probably Caucasian. Frey was the supervisor of the entire OCC, so according to the OCC organizational chart, the Nurse Manager (Rebecca Johann), MSA Supervisor (Sherman), and Administrative Officer (Stephanie Rodriguez)[3] all reported to her.

Although there is some dispute about exactly how Frey came to supervise Sherman,[4] the parties agree that at some point Frey began supervising Sherman. Sherman contends that once Frey began supervising her, she began "harassing" Sherman by talking down to her and correcting her speech.

**Sherman's Job Performance as MSA Supervisor**

As the MSA supervisor, Sherman was responsible for oversight of the daily efficiencies of the MSAs and assistant MSAs with the OCC which involved monitoring the consults coming into the OCC and processing the consults.

The OCC is responsible for processing and facilitating consults for veterans outside of the

---

[2] It is unclear from the record what the relationship is between the Acting Director and the Program Manager. As best the Court can tell, they are the same thing, or at least were equivalents, during the relevant period.

[3] Rodriguez became the Administrative Officer at some point, it is unclear when, after Sherman became the MSA supervisor. The exact timing is irrelevant to resolution of the pending motion.

[4] Sherman disputes who her first-line supervisor was; Sherman contends that Johann was her original supervisor and then Johann informed her she was delegating her supervision of Sherman to Frey, intimating that this was somehow illegal or nefarious. But the law does not prevent an employer from reassigning the supervision of an employee from one supervisor to another, even if that supervisory reassignment contradicts an organizational chart.

3

VA system. Consults occur for a variety of reasons, including when the VA does not offer a form of specialty care, when veterans live a significant distance from the VA and cannot get to a location, and when the VA has long wait times.

In 2018, Congress passed the Mission Act which went into effect on June 1, 2019. The Mission Act extended opportunities for veterans to access healthcare in the community outside of the VA. This resulted in a significant amount of change in the OCC, and specifically an increase in the number of consults and referrals to the OCC.

Throughout 2019 and into 2020 Frey worked with employees in HR, including Denise Smith and Felicia Truong, to work through how to address what Frey claimed were various performance issues with Sherman. Frey also received numerous complaints from other employees about Sherman failing to timely complete and assist with time and leave duties. Employees also reported to Frey that Sherman cursed during staff huddles.

Frey also raised numerous concerns about Sherman not understanding the OCC processes that she and her staff were involved in and declining training opportunities, as well as conveying incorrect information to external customers multiple times, and failing to keep up with incoming emails. Frey also expressed that she did a fact finding investigation which revealed that Sherman told MSAs not to enter veteran appointments which led to a significant increase in veterans having to wait over 30 days for consults.

In her deposition, Sherman contends Frey's comments were lies, and she was being retaliated against for speaking up about how the MSAs were being treated when the MSAs refused to perform tasks Sherman believed were the nurses' jobs.[5]

---

[5] Sherman also alleges that Frey set her up for failure by refusing to provide her training on the new Mission Act. But the proposed facts on which this argument is based, *see, e.g.*, PSOF 26–34, 36, ECF No. 61, are so vague, conclusory, and unsupported by evidence that the Court cannot consider them on a motion for summary judgment. *See Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) ("A plaintiff may not merely point to self-serving

4

Frey testified that beginning in August 2019, her communication with Sherman began to significantly deteriorate. Frey observed after the Mission Act was implemented in June 2019,

> we started feeling the full effects of the process changes by August, and it was overwhelming to Ms. Sherman. And as we were trying to communicate and get the processes, and adhere to the processes that were coming to us, to get care…we had a larger volume coming in, and to respond to all that, I think it became very difficult for her to keep up. And that's when her communication with, with me and the team deteriorated.

On November 8, 2019, Frey placed Sherman on a 90-day Performance Plan for fiscal year 2020. Sherman signed the plan indicating her receipt that same day.

On January 7, 2020, Frey attempted to give Sherman her 45-day progress review ("interim review)" which Sherman declined to sign. The progress review stated:

> Ms. Sherman lacks the understanding of the process changes that have been implemented at OCC. A best practice has not been submitted to the Chief. Ms. Sherman has not engaged in the AES action planning in OCC. Ms. Sherman has not exhibited facilitation of teamwork, cooperation or collaboration with the staff. Ms. Sherman has not demonstrated being personally accountable as she has not responded within 48 hours to routine administrative actions or leadership guidance. Ms. Sherman does not assure consistent supervisor coverage in her absence. Ms. Sherman often leaves T&L duties to others in the leadership team and does not maintain Acustaf. Ms. Sherman does not maintain access or superuser access to all programs used in OCC. Ms. Sherman does not effectively maintain good relationships with the internal leadership team and does not show initiative in building coalitions with external customers. Ms. Sherman has been assigned many aspects of the MISSION Act Implementation process in OCC with

---

allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor."); *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1028–29 (8th Cir. 2006) (noting conclusory allegations, speculation, and conjecture are insufficient to withstand summary judgment). In fact, documentary evidence in the record suggests just the opposite. Frey reported to HR in December 2019 that "Ms. Sherman often declines the opportunity for training as she did when we were lucky enough to have the National trainer for the new consult system HSRM last June. Ms. Sherman took personal calls throughout the day long training and left for several hours during the training." Frey email dated Dec. 27, 2019, Ex. G Bates No. 698, ECF 55-7.

no results given. Ms. Sherman is the direct supervisor for the MSA's that affect the metrics we follow and has not given a plan or results for any efforts made to improve the metrics.

The following day Frey emailed Sherman a copy of the interim review. Frey advised Sherman to let her know "[i]f you have questions or want to discuss improvements to become fully successful."

Frey explained that after the interim review was given to Sherman in early January, Sherman told Frey that she would not communicate with her anymore about her performance. Frey does not believe that after January 7, 2020, Sherman sent her an email or responded to an email from her, and Frey had no way to communicate with her. It is misconduct when an employee will not communicate with their supervisor.

On January 31, 2020, Sherman was given an unsuccessful performance appraisal. In her notes describing the rating, Frey wrote:

> Ms. Sherman has not met any standard for her performance plan. She has been in OCC for 14 months and has not been able to maintain the leadership skills necessary to be successful in her role. Ms. Sherman received her progress review and refused to discuss ways to improve her performance. No improvement has been observed.

**Sherman's Detail**

On February 21, 2020, the VA "detailed out"—temporarily transferred—Sherman from the OCC. The detail memorandum stated that a fact-finding investigation had been initiated into alleged misconduct. During the detail, Sherman's position of record remained Supervisory MSA, and she retained her GS-8 level compensation.

6

When the detail memo was delivered to Sherman, she was instructed to leave the OCC and report to Eddaliss Gonzalez-Ruiz. Sherman attempted to take her laptop and other documents with her when she left. Sherman ended up being escorted out of the OCC by VA security.

After Sherman was detailed out of the OCC, HR continued to assist with the inquiry into Sherman's misconduct.

### AWOL Allegations

Sherman claims that during her detail in March 2020, Frey improperly charged with being absent without leave ("AWOL"). The errant AWOL designation was corrected by David Isaacks. Ultimately, Sherman's timesheets reflect that she was not charged with AWOL and that she was paid as appropriate for the relevant week.

### Sherman's Privacy Act Complaint

Sherman alleges that Johann, the Nurse Manager, improperly viewed her medical and military information and that "no action" was taken by the privacy office after Sherman filed a complaint. It is unclear whether Johann ever impermissibly viewed Sherman's records.

Sherman is only aware of her colleague Brenda Hagan viewing her records because Denise Drummond, the privacy officer, contacted her about it. After the issue was flagged, Drummond initiated an investigation into the access and a week or two later concluded the investigation and issued a report finding there was no violation.

Sherman did not agree with this finding. Drummond told Sherman that she could appeal the outcome. Rather than appeal, Sherman retired.

### Sherman's Claims Regarding Race-Based Treatment at KCVA

Sherman contends Frey did not like "the manner" (it is unclear exactly what this means) in which Sherman spoke; Frey would cut Sherman off in meetings; Frey belittled and yelled at

Sherman in front of staff; and Frey was generally rude to her.   Sherman believes Frey prevented her from receiving the training she needed to do her job.   Sherman also alleges Frey said "really derogatory" and hateful things to her, such as Frey saying she (Frey) liked cream in her coffee or coffee in her cream.   Sherman contends Frey treated her this was because Sherman was the only African American supervisor in the OCC.

Sherman alleges that she was verbally attacked by white nursing staff and accused of pitting "her people" against them.   Sherman agrees "her people" referred to MSAs and was not a race-based comment.

When asked why she believes her treatment related to her protected characteristics, Sherman claimed that other employees were treated differently based on their races.   Sherman testified that two employees—a Caucasian lead MSA and an African American MSA—were treated differently for engaging in similar conduct.   Sherman also believes that a lead MSA and the Administrative Officer were treated better than her.[6]

Sherman opines that Caucasian MSAs and nurses were treated more favorably than African American MSAs.   But Sherman offers little in the way of specifics and only speculation that racial animus motivated any disparate treatment.[7]

---

[6] Sherman also makes an unsubstantiated allegation that a Caucasian employee named Todd was treated differently than African American employees.   Plaintiff's failure to provide any additional evidence or information about Todd makes this allegation inadmissible and useless.   *See Davidson*, 422 F.3d at 638 ("A plaintiff may not merely point to self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor."); *Bloom*, 440 F.3d at 1028–29 (noting conclusory allegations, speculation, and conjecture are insufficient to withstand summary judgment).

[7] For example, Sherman contends two African American MSAs that she supervised—she identifies neither by name—called her and complained that some of the Caucasian nurses—also not identified—"got up in their faces" and threatened them.   Afterwards, Frey called Sherman into her office and told her she needed to write up the two African American MSAs because they talked back to the nurses.   Sherman countered that the nurses were trying to foist their work onto the MSAs.   Again, Plaintiff's failure to provide any additional evidence or information about this episode renders it almost useless for summary judgment purposes.   *See Davidson*, 422 F.3d at 638; *Bloom*, 440 F.3d at 1028–29.

**Sherman's Promotion to Inventory Manager**

Around August 2020, Sherman decided to apply for an inventory manager position because she wanted to advance her career. She was placed in the position. The inventory manager role was a GS-9 level position. Sherman worked as an inventory manager until September 30, 2021, when she retired.

Sherman's supervisors in her inventory management position were Mike Murphy, Chris Hollis, and Tim Pippin. Sherman never had any issues with Murphy, Hollis, and Pippin and states that "[t]hey were the ones that encouraged me to continue, to keep my head up." Sherman did not interact with Frey at all after she took the inventory manager position.

Sherman claims that while she was inventory manager, Frey sent her new supervisors messages about her and her leave requests.

**Sherman's EEO Complaints**

Sherman's Complaint identifies two Equal Employment Opportunity Commission ("EEO") administrative proceedings in which she exhausted her current claims of discrimination—EEO Case Numbers 200J-0589-2020102637 ("EEO Claim 1") filed on March 19, 2020, and 200J-V115-2021100115 ("EEO Claim 2") filed on December 3, 2020. Sherman filed another EEO complaint on June 20, 2019, in EEO Case Number 200J-0589-2019103604, but no claims in this lawsuit are based on this third complaint. Sherman also concedes that the KCVA did not prevent her from filing any EEO complaints.

In EEO Claim 1, Sherman raised issues related to her February 21, 2020, detail out of the OCC and purported denial of sick and annual leave in March 2020. She also claimed that the performance plan she was placed on in November 2019 was improperly executed. Sherman cited

9

the bases of her claims as hostile work environment, discrimination, and retaliation based on race and prior protected activity.

In EEO Claim 2, Sherman raised discrimination, harassment, and retaliation claims based on prior protected activity and race. She brought complaints related to degrading comments, excess oversight, a poor performance appraisal, her acceptance of the inventory manager position, and the KCVA investigator purportedly "slow walking" her privacy complaint regarding individuals improperly viewing her medical and military records.

**This Lawsuit**

Sherman filed this lawsuit on December 21, 2021. On May 24, 2023, the Court denied her motion to consolidate this case with another lawsuit brought by an employee who worked in the OCC. This case was transferred to the undersigned on September 7, 2023.

The Complaint contains four counts. Count I alleges disparate treatment based on race and sex, and claims the adverse action taken against her includes constructively discharging her. Count II alleges a hostile work environment based on race, color, and national origin. Count III alleges Defendant retaliated against Sherman for complaining to the EEO; this retaliation includes constructive discharge. Count IV alleges Defendant constructively discharged Sherman because of her race and in retaliation for her complaints.

## Discussion

Defendant argues it is entitled to summary judgment on all counts. It contends Sherman failed to administratively exhaust her constructive discharge claims, and even if properly exhausted, these claims would fail on the merits. As for her discrimination and retaliation claims, Defendant contends they cannot survive under the *McDonnell-Douglas* burden shifting framework: Sherman cannot make a prima facie case and, even if she could, these claims would

10

still fail because Defendant articulated legitimate, non-discriminatory reasons for its actions and no evidence of pretext exists.

## I.     Sherman failed to administratively exhaust her constructive discharge claims.

Before filing suit, a claimant must give notice of all her claims in an administrative complaint. *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005) (holding plaintiff had not administratively exhausted a discriminatory refusal to rehire claim because it was not mentioned, or reasonably related, to the claim raised in the EEO charge). A constructive discharge claim is a discrete act of discrimination or retaliation that must be explicitly raised through the administrative process to be exhausted. *Henson v. Union Pac. R.R. Co.*, 3 F.4th 1075, 1081–82 (8th Cir. 2021). In this case, Sherman made no claim of constructive discharge, or anything reasonably related to constructive discharge, during the administrative process. Indeed, since Sherman had not quit or indicated that she intended to quit at the time she filed these EEO complaints, it would be difficult, if not impossible, to construe her administrative claims as encompassing constructive discharge.

Consequently, the Court holds Sherman failed to administratively exhaust any constructive discharge claim, so Defendant is entitled so summary judgment on all such claims.

Even if Sherman had properly exhausted these claims they would fail on the merits. "To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010). An employee must show more than just a Title VII violation to prove that a constructive discharge has happened. *Hoard v. Burns Bros., Inc.*, 149 F.3d 835, 841 (8th Cir. 1998). "A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable." *Tidwell v. Meyer's Bakeries, Inc.*,

93 F.3d 490, 494 (8th Cir. 1996).

Here, Sherman took a new position at the KCVA as inventory manager in August 2020. As inventory manager she changed supervisors and began reporting to Chris Hollis, Mike Murphy, and Tim Pippin. Sherman acknowledges these individuals advocated for her and treated her well. She worked in this position without issue until her retirement in September 2021, and there is no evidence that anything related to the position or her supervisors while she worked as inventory manager created an intolerable situation such that she was forced to leave the KCVA. There is nothing here indicating that a reasonable person in Sherman's position would have found her working environment intolerable at the time she retired.

## II.     Claims for sex-based discrimination or harassment fail.

The Court also holds that any claim for discrimination or harassment based on Sherman's sex fails. Sherman essentially concedes by her silence that she cannot maintain a sex-based claim for discrimination or harassment. In the argument portion of her briefing, Sherman cites no evidence suggesting sex had anything to do with her treatment at the KCVA, nor does she reference sex discrimination. In fact, only three of her 248 proposed additional facts have anything to do with sex discrimination; none evidence or give rise to an inference of sex-based discrimination or harassment during the relevant period. *See* PSOF 5, 6, 238, ECF No. 61.

Hence, Defendant is entitled to summary judgment on all claims alleging discrimination or harassment based on Sherman's sex.

## III.     Claims for race- or color-based discrimination or retaliation do not survive the *McDonnell Douglas* burden shifting analysis.

There is no dispute that Sherman has no direct evidence of race- or color-based

12

discrimination[8] or retaliation, thus she must prove her claims under the *McDonnell Douglas* burden-shifting framework. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015). Under the *McDonnell Douglas* framework, Sherman must first establish a prima facie case. *Huynh v. U.S. Dep't of Transp.*, 794 F.3d 952, 958 (8th Cir. 2015). If she does, then the burden shifts to Defendant to offer a legitimate, non-discriminatory reason for its action. *Id*. If Defendant can establish a legitimate, non-discriminatory reason for doing so, the burden shifts back to Sherman to prove Defendant's stated reason was pretext for discrimination. *Id*.

To make a prima facie case of race discrimination or retaliation, Sherman must show: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) "the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Carter v. Atrium Hosp.*, 997 F.3d 803, 809 (8th Cir. 2021).

Defendant argues Sherman cannot satisfy the third or fourth requirements because she cannot identify an adverse action or circumstances which gives rise to an inference of discrimination or retaliation.

In response, Sherman identifies three adverse actions. First, she contends she was "set up" for termination by not being trained on the Mission Act and then was disciplined for not having the required knowledge base. Second, she contends the KCVA violated its own policy in giving her a failing performance review. The failing performance review led to her reassignment from a supervisory to a non-supervisory, less prestigious position. Third, she argues Frey interfered in her attempt to get a job at a VA facility in Florida.

---

[8] The parties conflate the analysis on the race- and color-based claims, apparently either because the analysis is the same in this case, or Plaintiff has abandoned any claims based on color. In this Order, the Court uses the word "race" to mean "race and color."

None of these three alleged actions is sufficient to survive summary judgment. First, with respect to Plaintiff's allegations that she was not provided training, as noted in the "Statement of Facts" sections of this Order, these allegations are so vague, conclusory, and unsupported that the Court cannot consider them. Second, the record shows Sherman was not detailed out because of her poor performance review, but because a fact-finding investigation had been initiated into her alleged misconduct, the misconduct apparently being her failure to communicate with her supervisor. Third, Plaintiff's allegation that Frey interfered with Sherman's attempt to get a job at a VA facility in Florida is not based on admissible evidence, so the Court cannot consider it.[9]

Even if Plaintiff could identify a sufficient adverse action, she cannot satisfy the fourth element of a prima facie claim—that the circumstances gave rise to an inference of discrimination or retaliation.

While "the required showing for a prima facie case is a 'flexible evidentiary standard,'" which can be satisfied in a variety of ways, a plaintiff must produce some substantive evidence on this element. *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 774 (8th Cir. 2016). A plaintiff may, for example, show that a similarly situated employee not in the protected class was treated more favorably, show biased comments by a decisionmaker, produce evidence that the employer failed to follow its own policies, or produce evidence that the employer shifted its explanation of the employment decision. *Id.*

Sherman has not done any of this. For example, she identified no specific similarly situated employees who were treated more favorably. Sherman alleges she was verbally attacked

---

[9] Sherman testified in her deposition that she applied for a position in Florida, passed a second interview, and then did not hear anything more. Sherman Dep. p. 88-89, ECF No. 61-1. She then telephoned someone named Tracy at the KCVA to find out what happened. *Id.* at 88. Tracy allegedly told Sherman, "well they [it is unclear who "they" is] told me that Angela [Frey] said, you know, she started telling me Angela said that that's really not true and that she's your supervisor, not Rebecca Johann." *Id.* According to Tracy (as reported by Sherman), this led the Florida VA to question Sherman's trustworthiness which is why the Florida VA hired someone else. *Id.* at 88–89. The Court cannot consider this testimony because it is based upon a dizzying amount of inadmissible hearsay.

14

by white nursing staff and accused of pitting "her people" against them, and that Frey told Sherman she "did not like the way she talked." However, she concedes that "her people" referred to MSAs and was not a race-based comment, and the phrase "did not like the way she talked" is facially neutral and not evidence of race-based commentary or hostility. *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (affirming a district court cannot extrapolate racial animus from statements like "you don't know your place"). Nor is there evidence of failure to follow policies or shifting explanations of any decision making by supervisors at the KCVA. In short, there is insufficient evidence that Defendant's treatment of Sherman was motivated by racial discrimination or to retaliate.

Because Sherman cannot satisfy her burden to set forth a prima facie case for discrimination or retaliation based on race, Defendant is entitled to summary judgment on these claims.

## IV. There is insufficient evidence of a hostile working environment claim.

Finally, there is insufficient evidence of a hostile working environment to survive summary judgment. "The standard for demonstrating a hostile work environment under Title VII is demanding, and does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace." *Jackman v. Fifth Judicial Dist. Dep't. of Corr. Serv.*, 728 F.3d 800, 806 (8th Cir. 2013). To succeed on such a claim, Sherman must establish: (1) she is a member of a protected class; (2) unwelcome harassment occurred; (3) there is a causal nexus between the harassment and her protected-group status; (4) the harassment affected a term, condition, or privilege of her employment; and (5) Defendant knew or should have known of the harassment and failed to take remedial action. *Id*. at 805–06. This fourth element is particularly demanding as applied. Sherman must show "the workplace is permeated with discriminatory

15

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. at 805.

Sherman claims that at times she was subjected to offensive comments based on her race. But the few comments she cites—such as her claim Frey told her she liked cream in her coffee or coffee in her cream—fall far, far short of creating a hostile working environment under Eighth Circuit caselaw. *See Elmahdi v. Marriott Hotel Serv., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (holding that an employee being called "boy" and "black boy" on several occasions over a period of years was not enough to "constitute a steady barrage of opprobrious racial comment" sufficient to support a hostile work claim). Sherman's claims that she was unfairly criticized, called out in meetings, and escorted out of the office in a demeaning fashion when she was detailed out of the OCC are similarly insufficient. Indeed, there does not appear to be a causal nexus between Sherman's race and the "harassment." What appears to be happening here is, at worst, a garden-variety example of a manager disliking an employee, nothing based on racial animus. And it is well-settled that, "[h]ostile treatment by a manager based on employee conduct and not motivated by any protected characteristic or conduct, even if unreasonable, does not amount to legally actionable type of discrimination." *Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 796 (8th Cir. 2019).

## Conclusion

For the reasons set forth above, Defendant's motion for summary judgment, ECF No. 55, is GRANTED.

**IT IS SO ORDERED.**

Date:  April 23, 2024  

/s/ Greg Kays
GREG KAYS, JUDGE
UNITED STATES DISTRICT COURT

16